# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 09-389V
### (To be Published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
JILL BARRETT, parent of            *
K.B., a minor,                     *
                                   *      Special Master Corcoran
            Petitioner,            *
                                   *      Dated: May 13, 2014
        v.                         *
                                   *      Attorneys' Fees and Costs; Costs Incurred
                                   *      in Future; Guardianship Costs; Fees for
SECRETARY OF HEALTH AND            *      Referring Attorney
HUMAN SERVICES,                    *
                                   *
            Respondent.            *
                                   *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Ronald C. Homer*, Conway, Homer & Chin-Caplan, P.C., Boston, MA, for Petitioner.

*Heather Lynn Pearlman*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## ATTORNEYS' FEES AND COSTS DECISION[1]

On June 10, 2009, Jill Barrett, on behalf of her minor child, K.B.,[2] filed a petition seeking compensation under the National Vaccine Injury Compensation Program ("the Vaccine Program"). Respondent conceded entitlement in Petitioner's favor on December 2, 2009. After several years of filing medical records and reports from their respective life care planners, the parties eventually came to an agreement on compensation owed to Petitioner. To that end, Respondent filed a proffer for award of compensation on October 24, 2012. After a decision by the prior special master responsible for this case (*see* November 19, 2012 Decision (ECF

---

[1] Because this decision contains a reasoned explanation for my actions in this case, I will post it on the United States Court of Federal Claims website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the published decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." (Vaccine Rule 18(b)). Otherwise, the whole decision will be available to the public. (*Id*.)

[2] Vaccine Rule 16(b) states that petitions filed on behalf of a minor may refer to that individual only by his or her initials.

No.80)), a judgment was entered on November 21, 2012 (ECF No. 82) awarding lump sum compensation in the total of $512,076.00 to the Petitioner, along with the funding of an annuity to meet K.B.'s anticipated care needs. Petitioner formally elected to accept this judgment in a November 26, 2012 filing (ECF No. 83).

Ms. Barrett subsequently filed a motion for reimbursement of attorneys' fees and costs on May 17, 2013 ("Fee App."). Ms. Barrett specifically requests compensation for her attorney, Mr. Ronald Homer, and other attorneys working at his firm, as well as another attorney, Mr. John Gismondi, who performed work in 2006 and 2008 prior to the filing of the petition. (*Id.* at Tab C). She also requests reimbursement of out-of-pocket costs incurred for establishing a guardianship for K.B., plus related costs she anticipates she will incur in the future through the administration of the guardianship. (*Id.* at Tab D). In total, Ms. Barrett requests $47,780.10 for attorneys' fees, $48,912.42 for attorneys' costs, and $49,725.00 for guardianship costs. (*Id.* at 1).

Respondent filed an opposition on June 3, 2013 ("Fee App. Opp."), outlining several objections to the two broad categories of requested reimbursements. With respect to the attorneys' fee requests, Respondent objected that (a) Mr. Homer and his firm, Conway, Homer & Chin-Caplan, P.C. (the "Homer Firm") had overcharged for the work performed and/or engaged in duplicative billing practices, (b) Petitioner's counsel had improperly charged for travel time, and (c) Petitioner had failed to substantiate the reasonableness of Mr. Gismondi's hourly rate. (Fee App. Opp. at 4-5). Respondent also challenged Petitioner's request for $49,725.00 in anticipated costs relating to the future operation of the guardianship. (*Id.* at 6).

Petitioner thereafter filed a reply on June 20, 2013 ("Reply") as well as some supplemental requests asking for the additional fees incurred in litigating this dispute.[3] In addition, pursuant to my March 6, 2014 Order, the parties filed short briefs addressing the propriety of costs associated with the guardianship. Petitioner filed a supplemental brief on March 21, 2014 ("Supp. Brief"), and Respondent's brief was filed on March 28th ("Supp. Resp.").

Ms. Barrett's application for attorneys' fees and costs is now ready for adjudication. As set forth in greater detail herein, it is my reasoned decision that Petitioner is entitled to most of

---

[3] Ms. Barrett filed a supplemental motion for attorneys' fees in which she requests $3,009.70 in attorneys' fees and costs associated with preparation of the June 20, 2013 Reply. Respondent has indicated that she has no objection to this supplemental request (*see* August 28, 2013 Response). Ms. Barrett filed a second supplemental motion for attorneys' fees and costs on September 9, 2013, in which she requests an additional $1,006.20 for preparing a reply to Respondent's response to Petitioner's first supplemental motion for attorneys' fees. The reply was necessitated by the fact that Respondent's August 28th Response also addressed issues pertaining to Mr. Gismondi's requested fees. Respondent never made a written response to this second supplemental motion, and is therefore deemed to have waived any objection she might have to this additionally requested sum. Finally, Petitioner filed a third supplemental application for attorneys' fees on March 21, 2014 in which she requests an additional $2,472.20 in attorneys' fees and costs for preparing the supplemental pleading I requested in my March 6, 2014 Order pertaining to the anticipated guardianship costs. With Respondent's time to object to this request also having passed without response, I will grant this third supplemental request as well.

In total, these three supplemental fees requests seek an additional $6,488.10 in fees, which I grant and include in the total calculation of fee award set forth at the end of this decision.

her attorneys' fee request, with some slight reductions for the work done by Mr. Gismondi, but should not be awarded the costs associated with anticipated guardianship activities in the future.

## ANALYSIS

### I.    General Principles Regarding Attorneys' Fees and Costs Awards

Petitioners in the Vaccine Program who receive compensation are entitled to an award of their attorneys' fees and costs. However, such fees and costs must be "reasonable." (42 U.S.C. § 300aa–15(e)(1) (2012)). It is for the special master to evaluate and decide whether this is the case. *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994). To this end, the special master has discretion in determining what is a reasonable fee award, and may reduce hours *sua sponte*, apart from objections raised by Respondent and without providing a petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Perreira*, 27 Fed. Cl. at 34 (special master has "wide discretion in determining the reasonableness" of attorneys' fees and costs).

The special master is not obligated to evaluate fee petitions on a line-by-line basis. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521-22 (Fed. Cir. 1993) (approving the special master's elimination of 50 percent of the hours claimed); *see also Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 728–29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction in the number of hours from 515.3 hours to 240 hours); *Edgar v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 506 (1994) (affirming the special master's awarding only 58% of the numbers of hours for which compensation was sought). As the U.S. Supreme Court instructs, when awarding attorneys' fees, trial courts may use estimates to achieve "rough justice." *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).

Reasonable attorneys' fees are determined using a two-part process. The initial determination uses the lodestar method – "'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). The second step is adjusting the lodestar calculation upwards or downward. (*Avera*, 515 F.3d at 1348). This standard for calculating a fee award is considered applicable in most cases where a fee award is authorized by federal statute. *Hensley v. Eckerhart*, 461 U.S. 424, 429-37 (1983).

An attorney's reasonable hourly rate is more precisely understood to be the "prevailing market rate" in the relevant forum. *Avera*, 515 F.3d at 1349; *Rodriguez v. Sec'y of Health & Human Servs.*, No. 06-559, 2009 WL 2568468, at *2 (Fed. Cl. Spec. Mstr. July 27, 2009), *review denied*, 91 Fed. Cl. 453 (2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011). That rate is in turn determined by the "forum rule," which bases the award rate on the rates paid to similarly qualified attorneys in the forum where the relevant court sits (Washington, D.C. for Vaccine Act

cases). *Avera,* 515 F.3d at 1348.[4] After the hourly rate is determined, the reasonableness of the hours expended must be considered. *Sabella,* 86 Fed. Cl. at 205-06. This inquiry mandates consideration of the work performed on the matter, the skill and experience of the attorneys involved, and whether any waste or duplication of effort is evident. *Hensley,* 461 U.S. at 434, 437.

Evaluating an attorneys' fee application involves more than the mere performance of a mathematical calculation. In analyzing all stages of the lodestar calculation, I must determine if the fee applicant has established the reasonableness of the relevant component. *Mares v. Credit Bureau of Raton,* 801 F.2d 1197, 1210 (10th Cir. 1986) ("[i]t remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero.")[5] Quoting a decision by the United States Supreme Court, the Federal Circuit has characterized the contours of what a reasonable fee request looks like:

> The [trial forum] also should exclude from this initial fee calculation hours that were not "reasonably expended." . . . . Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."

*Saxton,* 3 F.3d at 1521 (Fed. Cir. 1993) (quoting *Hensley,* 461 U.S. at 433-34).

Petitioners bear the same reasonableness burden in seeking to obtain an award of costs. *Perreira*, 27 Fed. Cl. At 34; *Presault v. United States*, 52 Fed. Cl. 667, 670 (2002). When petitioners fail to carry this burden, such as by not providing appropriate documentation to substantiate a requested cost, special masters have refrained from awarding compensation. *See, e.g., Gardner-Cook v. Sec'y of Health & Human Servs.*, No. 99-480V, 2005 WL 6122520, at *4 (Fed. Cl. Spec. Mstr. June 30, 2005). This practice is consistent with how the Federal Circuit and the Court of Federal Claims, the immediate courts that review decisions of special masters, have interpreted other federal fee-shifting statutes. *See Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed. Cir. 1987) (interpreting the Equal Access to Justice Act); *Presault*, 52 Fed. Cl. at 679 (interpreting the Uniform Relocation Assistance and Land Acquisition Policies Act of 1970).

---

[4] There is also an exception to the forum rule that applies if the bulk of the attorney's work was performed outside of Washington, D.C., in a location where prevailing rates are substantially lower. *Avera,* 515 F.3d at 1349.

[5] Although *Mares* did not interpret the specific attorneys' fee provision of the Vaccine Act, fee-shifting statutes are interpreted similarly. *Avera,* 515 F.3d at 1348.

**II.**       **Specific Issues Raised by Petitioner's Fee Application**

Respondent raises challenges to both the attorneys' fee portion of Ms. Barrett's Fee Application as well as certain components of her costs request.[6] I will address these challenges in their order of the magnitude.

      A.    *Cost of Establishing Guardianship and Then Utilizing it to Access Annuity Disbursements*

Petitioner's request for $49,725.00 in costs associated with the operation of a guardianship to be established to help administer K.B.'s Program Award constitutes slightly more than one-third of the Petitioner's total Fee Application. Before considering whether to award these costs, it would be helpful to review the specific aspects of the procedural history relevant to the guardianship in this case.

      1.    <u>K.B.'s Life Care Plan</u>

In this action, the parties' life care planners succeeded in agreeing upon the amount of care K.B. would require in light of her vaccine-related injury. To that end, they entered into a Proffer that formed the basis of the special master's entitlement decision and subsequent Judgment in this case. (*See* Proffer, dated October 24, 2012 (ECF No. 79)). In addition to specifying lump sum payments to be made directly to Petitioner[7], the Proffer also mandated an award "sufficient to purchase an annuity contract" that would provide payments for the items set forth in the life care plan (appended to the Proffer as Tab A). These payments could be paid annually or in other installments subject to Respondent's sole discretion. (*Id.* at 5).

Although the Proffer and the Judgment are silent as to the total amount of the annuity, the case docket indicates (in an unnumbered docket entry from December 21, 2012) that one was purchased in the amount of $2,200,000. A chart appended to both the Proffer and the special master's subsequent November 19, 2012 Decision (Tab A) and entitled "Summary of Life Care Items – Agreed Life Care Plan dated October 12, 2012" projected the annual payments from the annuity for K.B.'s care from 2012, when K.B. was 7, until she became 80 years old. The sum of anticipated yearly annuity payments to K.B. while she was a minor (*i.e.* until she reached the age of 18) but not included in the lump sum payments was $92,006. (ECF No. 80-2 at 1 (Tab A)).

      2.    <u>Establishment of Guardianship as Prerequisite to Award</u>

The Proffer also specifically conditioned payment of the entitlement award on Ms. Barrett's certification that either she or another party "appointed by a court of competent jurisdiction" had been named guardian for K.B. (Proffer at 5-6). It similarly provided that the annuity "shall make payments directly to petitioner as guardian/conservator," thus envisioning

---

[6] Respondent makes no challenge whatsoever to the majority of the $48,912.41 in attorney costs that Petitioner seeks, outside of the guardianship-related costs that I address herein. (*See* Fee Application at 1).

[7] Petitioner was awarded lump sum payments of (a) $479,039 representing compensation for lost future earnings, pain and suffering, and Year One life care expenses, (b) $2,561 representing compensation for past unreimbursed expenses, and (c) $30,476 representing compensation for satisfaction of the Pennsylvania Medicaid lien.

that a guardianship would be in place before such payments could be made. (*Id.*). This requirement was carried over into the decision awarding compensation in this case and subsequent Judgment.

The following year (and in the midst of litigating this fee application), Ms. Barrett filed in this action an Order from the Court of Common Pleas of Allegheny County, Pennsylvania, Orphans' Court Division (the "Orphans' Court"), dated September 2013. The Order indicated that First Commonwealth Bank-Trust had been appointed legal guardian for K.B.'s estate. (September 13, 2013 Notice (ECF No. 96)). The Orphans' Court Order specifically provides that K.B.'s guardian is to file an annual report, but is otherwise silent as to the guardian's responsibilities, and does not refer to the Judgment from the Vaccine Court that mandated the establishment of the guardianship in the first place.

### 3.   Evidence offered in Support of Guardianship Cost Request

In support of her requests for future guardianship costs, Ms. Barrett offers a document, dated May 16, 2013 and titled "Estimate for Ongoing Costs Associated with Guardianship" from Michael D. Flynn, Esq., the attorney who appears to have performed the tasks necessary for the establishment of the guardianship. (Fee App. at 95). Mr. Flynn provides a breakdown of anticipated costs associated with having the guardian prepare an Orphans' Court petition for disbursement of funds from K.B.'s annuity. (*Id.*). Mr. Flynn estimates that it will cost $828.75 each time a disbursement of funds from the guardianship is required, and further calculates that the guardian will need to obtain approximately six disbursements each year for the next ten years. (*Id*). Thus, according to Mr. Flynn, ensuring the guardianship's access to K.B.'s annuity disbursements for the next ten years will cost nearly $50,000. (*Id.*)

In response to my request for additional briefing on the matter, Petitioner has also offered a declaration from Mr. Flynn in which he attempts to explain the need for his future services based upon Pennsylvania law. (ECF No. 100 at 9 - 11). Mr. Flynn asserts that 20 Pa. Cons. Stat. Ann. § 5164 (2006) ("Section 5164")[8] is the relevant provision of Pennsylvania law governing distributions obtained by a guardian from a trust or sum of money intended for the benefit of a minor. He states that it "absolutely requires that a Petition for Allowance be prepared and approved by the Orphans' Court . . . if a disbursement of money is being sought from the principal." (*Id.* at 10). Thus, according to Mr. Flynn, "a Petition for Allowance, and the concomitant fees & costs, would be required each time the principal is to be invaded to provide a disbursement for K.B.'s benefit." (*Id.* at 11).

Mr. Flynn's cost estimate notably excludes the costs associated with setting up the

---

[8] Section 5164 of Pennsylvania's Probate & Estate Fiduciary Code (Title 20), entitled "Distributions for Support and Education," provides in relevant part that

> [a]ll income received by a guardian of the estate of a minor . . . may be expended in the care, maintenance and education of the minor *without the necessity of court approval*. The court, for cause shown and with only such notice as it considers appropriate in the circumstances, *may* authorize or direct the payment or application of any or all of the income or principal of the estate of a minor.

20 Pa. Cons. Stat. Ann. § 5164 (2006) (emphasis added).

guardianship for K.B. However, Ms. Barrett's application separately accounted for those costs, including them in the attorneys' costs section of her overall fee application. As established by the April 9, 2013 and May 14, 2013 invoices appended to the end of Tab B of Ms. Barrett's Fee Application, these costs total $1,192.00. (*See* Fee Application at 52-54).

4.   Legal Grounds for Awarding Guardianship-related Costs in the Vaccine Program

Respondent raises several objections regarding Ms. Barrett's requested guardianship costs. (Fee App. Opp. at 6-9). First, Respondent argues that it is improper to award Ms. Barrett the cost of establishing the guardianship because such costs have not been awarded in prior decisions, and to do so here would be contrary to the Act. (*Id.* at 6-7). These objections are unpersuasive. Though it is true that in the past guardianship establishment costs were not routinely compensated over the history of the Vaccine Program, over time the special masters have usually awarded such costs where the guardianship is established as a condition of the settlement and/or judgment in the matter. *See, e.g.*, *Torres v. Sec'y of Health & Human Servs.*, No. 09-867V, 2013 WL 2256136 (Fed. Cl. Spec. Mstr. Apr. 30, 2013); *Cansler v. Sec'y of Health & Human Servs.*, No. 09-596V, 2011 WL 597791 (Fed. Cl. Spec. Mstr. Feb. 2, 2011); *Ceballos v. Sec'y of Health & Human Servs.*, No. 99-97V, 2004 WL 784910 (Fed. Cl. Spec. Mstr. Mar. 25, 2004).

In this case, the existence of a proper guardianship was a prerequisite to payment of the entitlement award, and therefore was contemplated by the parties before entry of judgment. Costs incurred in direct connection with the terms of the Judgment itself can be reasonably construed as "proceedings on a petition" (§ 300aa-15(e)(1)) because they are only incurred as a condition of payment. *See Gruber v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 773, 782 (2010). In addition, the costs associated with the guardianship's creation are both modest and in line with similar costs incurred in other cases. *See, e.g., Amar v. Sec'y of Health & Human Servs.*, No. 06–221V, 2011 WL 6077558, at *24 (Fed. Cl. Spec. Mstr. Nov. 10, 2011) (awarding $3,520.50 for guardianship costs*); Doe 21 v. Sec'y of Health & Human Servs.*, No. 02–411V, 2011 WL 6941671, at *10 (Fed. Cl. Spec. Mstr. Oct. 26, 2011) (awarding $3,590.00 for guardianship costs); *Finet ex rel. Finet v. Sec'y of Health & Human Servs.*, No. 03–348V, 2011 WL 597792, at *3 (Fed. Cl. Spec. Mstr. Jan. 31, 2011) (awarding $7,440.00 for guardianship costs). I thus find that the awarding of this category of guardianship-related costs is both sensible and permissible under the Act.

Second, Respondent objects to awarding Ms. Barrett her anticipated legal costs associated with the guardian's *future* exercise of its duties. Here, Respondent is on firmer ground. As Respondent points out, such costs have not yet been incurred in the literal sense of being owed "at present." (Fee App. Opp. at 7-9). Rather, Petitioner anticipates having to pay attorneys' fees to fund the guardian's repeated trips to the Orphans' Court to file motions for "allowance" permitting an annuity disbursement. (Reply at 9). Granting this aspect of the Fee Application therefore entails awarding costs that Ms. Barrett not only does not presently owe, but may well never owe, depending on the future vagaries of life.

This the Act does not permit. (*See* 42 U.S.C. § 300aa-15(e)(1) (special masters may only

award reimbursement for costs "***incurred in any proceeding*** on [the vaccine injury] petition" (emphasis added)). Indeed, the fact that requested costs have yet to be incurred has been fatal to a variety of cost requests in other cases. *See, e.g., Fowler v. Sec'y of Health & Human Servs.*, No. 03-1974V, 2013 WL 5513880, at *1 (Fed. Cl. Spec. Mstr. Sept. 13, 2013) (denying an award of "purely speculative" costs because the costs had "not been incurred . . . [and] may never be incurred"). And Petitioner's valiant attempt to give the word "incur" a more expansive definition does not find support in the decisions of the Court of Federal Claims. *Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) ("[o]ne incurs an expense . . . at the moment one becomes legally liable, not at the moment when one pays off the debt, nor *at the moment when one decides that an expense will become necessary one day in the future*") (emphasis added); *aff'd in rel. part*, 93 F.3d 781, 786 (Fed. Cir. 1996); *see also Fester v. Sec'y of Health & Human Servs.*, No. 10-243V, 2013 WL 5367670, at *16 (Fed. Cl. Spec. Mstr. Aug. 27, 2013) (discussing in detail the subsequent procedural history of *Black* and the Court of Federal Claims's analysis of the definition of "incur").

Equally problematic is Petitioner's failure to establish that the requested costs are necessary - that Pennsylvania law actually requires a guardian to make multiple applications per year to the Orphans' Court in order to fund the care contemplated in Ms. Barrett's entitlement award. Petitioner cites to no case law in which this has occurred in the past or been permitted by the decision of a special master. And the state law authority Ms. Barrett cites as the basis for her request (Section 5164) actually suggests the opposite: that annuity payments may be freely disbursed by the appointed guardian so long as they are intended to pay for K.B.'s welfare. (*Id.* ("[a]ll income received by a guardian of the estate of a minor . . . may be expended in the care, maintenance and education of the minor *without the necessity of court approval*") (emphasis added)).[9]

Because Petitioner's fee application did not adequately address this facial contradiction between her argument and the plain language of the cited provision of Pennsylvania law, I provided Petitioner the opportunity to brief these points in greater detail. I also invited Respondent to reply. (*See* ECF No. 99). With her supplemental briefing, Petitioner offered a declaration from Mr. Flynn in which he states that Pennsylvania law does in fact require his services in order to obtain the annuity payments. (Supp. Brief at 9 - 11).

I note generally that an attorney's naked opinion, sworn or otherwise, as to what the law *is* has low value to a court – and in fact invades the province of this tribunal in determining the law. *See, e.g., Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1379 n.6 (2008) (affording no weight to affidavit of former government official interpreting thrift regulations); *El–Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1361 (Fed. Cir. 2004) ("it is emphatically the province and duty of the judicial department to say what the law is") (*quoting Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). Because the Federal Rules of Evidence

---

[9] Notably, the Orphans' Court order creating the guardianship does provide for the appointed guardian to make an annual report as to its activities – and presumably this report would specify the sums spent on behalf of K.B. toward her care. *See* ECF No. 96-1 (Order of Court Appointing Guardian of the Estate). Such a report would thus provide some protection to K.B. if the guardian could not account for all disbursements from the annuity.

do not govern this proceeding, I am not prohibited from considering this declaration[10], but Mr. Flynn's testimony contained therein offers an expert opinion on the law that would likely be (and for good reason) inadmissible in the Court of Federal Claims as well as other tribunals. *See, e.g.*, *Mola Dev. Corp.*, 516 F.3d at 1379 n.6 (because the proper interpretation of agency regulations is an issue of law, expert testimony relating to this question, such as the affidavit of a former government official, should not be received, much less considered); *see also Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977), *cert. denied*, 434 U.S. 861 (1977); *Aguilar v. Int'l Longshoremen's Union*, 966 F.2d 443, 447 (9th Cir. 1992).

But even if I ignore the conclusory character of Mr. Flynn's assertions, I do not find that the contents of his declaration substantively support Petitioner's argument. Mr. Flynn provides no other citations to relevant Pennsylvania authority establishing that the annuity payments can only be accessed after obtaining leave of the Orphans' Court. In an effort to get around the plain language of the statute, Mr. Flynn interprets Section 5164 to apply "*only* to income, and not to principal amount." (Supp. Brief at 10 (Flynn Dec. ¶ 4) (emphasis in original)). Thus, according to Mr. Flynn, "[t]he portion of Section 5164 pertaining to 'income' is only applicable to any income generated by K.B.'s Vaccine Program award," (*Id.*) and therefore the monies disbursed from the annuity purchased on K.B.'s behalf constitute its "principal," making it necessary to seek Orphans' Court approval before they can be obtained.

This argument reflects a misunderstanding of how an annuity functions. Black's Law Dictionary defines "annuity" to be "[a]n obligation to pay a stated sum, usu. monthly or annually, to a stated recipient. These payments terminate upon the death of the designated beneficiary." *Black's Law Dictionary* (9th ed. 2009). As the Supreme Court of Pennsylvania has noted, an annuity "designates a right—bequeathed, donated or purchased—to receive fixed, periodical payments, either for life or a number of years. Its determining characteristic is that the annuitant has an interest only in the payments themselves and *not in any principal fund or source* from which they may be derived." *Commonwealth v. Beisel*, 338 Pa. 519, 521, 13 A.2d 419, 420-21 (1940)(emphasis added); *see also Unisys Corp. v. Pennsylvania Life and Health Ins. Guar. Ass'n*, 667 A.2d 1199, 1202 (Pa. Commw. Ct. 1995), *aff'd*, 546 Pa. 256, 684 A.2d 546 (1996).

Accordingly, the very definition of annuity recognizes a distinction between the principal amounts that form its core (and in which K.B. has no interest) and the payments it generates for her use. K.B.'s guardian cannot invade the annuity in order to pay for her care – but more importantly, she need not. Rather, the guardian only has to follow the terms of the life care plan and apply the payments the annuity generates toward the costs of K.B.'s care. It is therefore reasonable to understand the annuity payments to constitute "income" as the term is used in Section 5164. This is consistent with the statute's actual definition of income as incorporated in Section 5164. Section 5164 specifically references Title 20, Chapter 81 for its definition of income. That subsection of the "Decedents, Estates and Fiduciaries" statute defines income as "money or property which a fiduciary receives as current return from a principal asset." 20 Pa. Cons. Stat. Ann. § 8102 (2006). Such a definition reasonably includes the annuity payments that K.B.'s guardian will receive for her care, since those payments are the "return" on the annuity's

---

[10] The Vaccine Rules explicitly provide that "[i]n receiving evidence, the special master [is] . . . not . . . bound by common law or statutory rules of evidence." (Vaccine Rule 8(b)(1)).

principal value (and in fact, the annuity is crafted specifically in consideration of the anticipated magnitude of payments required).

The terms of the Orphans' Court Order creating the guardianship also do not aid Ms. Barrett's argument. That Order only requires the appointed guardian (a financial institution) to make an annual report as to its activities, and says nothing about applying to the Orphans' Court for allowances to spend the annuity payments. Mr. Flynn's cost projections do not appear to include the cost of preparing such a report – a more limited category of cost, but one special masters have denied. *See, e.g., Fowler,* 2013 WL 5513880, at *1.

Ms. Barrett's supplemental brief suggests that to disallow these costs would subvert the remedial goal of the Program award already granted in this case. (*See* Supplemental Filing at 5).[11] But I am not empowered to award speculative or contingent costs not actually incurred to date – and to do so would in fact constitute the undermining of Program goals that Petitioner fears. Because Petitioner has failed to establish why future costs associated with operating the guardianship are reasonable or permissible under the Vaccine Act, I do not award Petitioner this particular category of costs.

      B.    *Challenges to Homer Firm Fee Requests*

Respondent has affirmatively stated that she has no objection to the hourly rate of the various Homer Firm attorneys who performed services in this matter. Because those rates appear reasonable to me in light of both other cases involving Homer Firm attorneys, and because they seem to reflect a reasonable hourly rate calculation under *Avera* and the decisions of other special masters, I will accept them as the basis for the lodestar calculation for the Homer Firm's fees in this case. *See Avera*, 515 F.3d at 1353(Rader, J., concurring). My analysis instead focuses on the reasonableness of the work performed and the time taken to do it.

      1.    <u>Duplicative Work Performed by Homer Firm Attorneys</u>

Without identifying more than a few billing entries or proposing specific reductions, Respondent makes a series of objections to Petitioner's request for $47,780.10 in attorneys' fees. First, Respondent objects to the Homer Firm's "common practice" of "multiple attorneys . . . bill[ing] for attending the same meeting." (Fee App. Opp. at 4). Respondent maintains that this practice is "duplicative and unreasonable, and should be disallowed." (*Id.* at 4-5).

---

[11] In arguing for creation of a fund to pay the anticipated costs of operating the guardianship, Ms. Barrett also suggests that Respondent has unreasonably refused a less reasonable alternative - an irrevocable trust – the creation of which would have obviated the need to expend resources applying for Orphans' Court permission for disbursement of the entitlement award annuity funds, because such a trust could include an automatic schedule for disbursement of annuity sums. (*See* Reply at 7-8). But the Proffer in this case (that formed the basis of the Decision and subsequent Judgment) did not provide for such an irrevocable trust to be established in the first place. In effect, Ms. Barrett asks me to mandate an alternative form of the entitlement award if I cannot or will not grant the requested guardianship costs, based upon her post-judgment determination that such a form of award is preferable. If this is Petitioner's actual goal, the appropriate way to proceed would be to file a motion for relief from the judgment. (*See* Vaccine Rule 36 (permitting Petitioners to receive relief from judgment under Rule 60 of the Rules of the Court of Federal Claims)). To date, Petitioner has not lodged such a motion.

Ms. Barrett attempts to rebut this assertion by arguing that the Homer Firm's use of multiple attorneys "is important in providing the best representation possible, and is consistent with their professional obligations to represent their client." (Reply at 3). Petitioner further notes that the Homer Firm has "operat[ed] this way since the Vaccine Program's inception." (*Id.* at 2).

There is no doubt that the Homer Firm - a small law firm when compared with many of the national firms that employ hundreds of attorneys – enjoys a unique position among the practitioners in the Vaccine Program, both in terms of the number of counsel it employs (and can therefore assign to a matter) as well as the concomitant expertise it can marshal on behalf of its clients.[12] Having so many attorneys work its clients' cases "virtually guarantees some work (such as an intra-office memo) is done that, strictly speaking, would not be needed if only one attorney were staffing the case." *Caves v. Sec'y of Health & Human Servs.*, No. 07-443V, 2012 WL 6951286, at *4 (Fed. Cl. Spec. Mstr. Dec. 20, 2012). Some special masters have cast a jaundiced eye on the inflated attorneys' bills that may result from the inherently "duplicative work and incredible inefficiency" produced by such staffing practices. *Hiland v. Sec'y of Health & Human Servs.,* No. 10-491V, 2012 WL 542683, at *11 (Fed. Cl. Spec. Mstr. Jan. 31, 2012).

Nevertheless, the mere fact that a Vaccine Program-oriented firm staffs its cases with large numbers of attorneys (in comparison to other Program practitioners) does not inexorably lead to the conclusion that its fees must always be reduced. Rather, the important question is "whether having [multiple] attorneys is *unreasonable*." *Davis*, 2012 WL 4748079, at *2 (emphasis added). It need not be automatically assumed that multiple attorneys cannot efficiently and productively work on the same matter, applying their skills and performing their duties in a complementary, non-duplicative manner. Indeed, this is a common practice among lawyers outside the Vaccine Court. *See, e.g.*, *Applegate v. United States*, 52 Fed. Cl. 751, 770 n.32 (2002) ("[b]ased on the complexity of the issues in this case, the court finds that the use of multiple attorneys was reasonable and likely contributed to the ultimate success in this matter").

Thus, simply objecting to the Homer Firm's use of multiple lawyers is not a sufficient basis for reducing this, or any other, fee application. Rather, some specific instances in which unnecessary duplication appears from the billing records should be identified – and such duplication should be widespread and significant as well if it is to justify the "consuming of judicial resources" that will be required to identify and then strike redundant time from a fee application. *See Caves*, 2012 WL 6951286, at *4 (citing *Melnikova v. Sec'y of Health & Human Servs.*, No. 09–322V, 2012 WL 1339606 (Fed. Cl. Spec. Mstr. Mar. 27, 2012) (reducing a fee

---

[12] In *Davis v. Sec'y of Health & Human Servs.*, No. 07-451V, 2012 WL 4748079, at *2 (Fed. Cl. Spec. Mstr. Sept. 6, 2012), another special master commented upon the difference between the Homer Firm and the majority of other Vaccine Program attorneys:

> On a superficial basis, it seems unusual to have six attorneys work on a case . . . In the undersigned's experience, a single attorney litigates the majority of cases in the Vaccine Program. In other cases, the case is staffed by one experienced attorney and one associate attorney. These staffing models can achieve satisfactory results for the client. *See, e.g., Heinzelman v. Sec'y of Health & Human Servs.*, 681 F.3d 1374 (Fed. Cir. 2012) (exemplifying a solo attorney's successful defense of a special master's decision on appeal). It is only [the Homer] firm that devotes so many attorneys to one case.

request by $272.50 for a total of one hour spent by four different attorneys from the Homer Firm)).

Here, Respondent has identified only three instances of purported duplication (*see* Fee App. Opp. at 4). Thus, Respondent specifically objects to: (i) "attorneys Homer and Ciampolillo each bill[ing] 0.5 hours for a case meeting" on December 15, 2009, to (ii) "attorneys Homer and Fashano each bill[ing] 0.2 hours for a case meeting" on January 4, 2010, and to (iii) "attorneys Homer and Pepper each bill[ing] 0.3 hours for a case meeting" on January 20, 2010. (*Id*). Respondent notes that these three entries "appear on one page of billing." (*Id.* (citing Fee Application at 10)).

After review of the billing records and attorney time sheets appended to the Fee Application, I find that the Homer Firm's practice of its multiple attorneys individually billing for their meetings with one another was not so widespread in this particular case as to warrant any reduction in the fee request. Although the practice could in some circumstances amount to an unnecessary and unreasonable use of time, the amount of allegedly duplicative time in this case appears minimal. Thus, no time will be reduced from Petitioner's fee application based on this objection.

## 2.    Travel Time

Respondent next objects to Mr. Homer individually charging his full hourly rate for five hours of travel time to and from an onsite visit with Petitioner, asserting that "there is no evidence in the invoice to support a full rate award." (Fee App. Opp. at 5). Ms. Barrett counters this argument by stating that Mr. Homer was working while traveling to and from the onsite visit. (Reply at 3). Petitioner also asserts that "preparation in the hours leading up to the onsite visit was essential" because "the damages phase of this case was complex." (*Id.*) Thus, "[t]hese fees are reasonable and should be compensated at counsel's full hourly rate." (*Id.*)

Special masters generally award Petitioners' attorneys half their hourly rate for travel, based on the assumption that attorneys do not work at their full capacity when traveling. *See, e.g.*, *Rodriguez v. Sec'y of Health & Human Servs.*, No. 06-559V, 2013 WL 1189451, at *16 (Fed. Cl. Spec. Mstr. Mar. 1, 2013). However, this rule of thumb is not ironclad, and should yield to those instances in which the attorney can substantiate that his travel time was applied to work. *Kuttner v. Sec'y of Health & Human Servs.* No. 06-195V, 2009 WL 256447 at *10 (Fed. Cl. Mstr. Jan. 16, 2009) ("[W]hether travel should be billed at ½ time or full time depends on whether counsel is working while traveling, the fact of traveling by itself is not determinative…Thus, if counsel can establish how much of the travel time is devoted to working, those hours will be compensated fully"). Full time for travel has been awarded when, for example, the attorney's records demonstrated that he used that time to prepare for trial or otherwise established that the time was productively spent. *See generally Calise v. Sec'y of Health & Human Servs.* No. 08-865V, 2011 WL 2444810 at *6 (Fed. Cl. Spec. Mstr. Jun. 13, 2011); *Burgess v. Sec'y of Health & Human Servs.* No. 07-258V, 2011 WL 159760 at *2 (Fed. Cl. Spec. Mstr. Jan. 3, 2011). As always, the petitioner bears the burden of establishing the reasonableness of her fee request. *See Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 484 (1991).

Mr. Homer has provided a plausible defense for charging his full rate for these five hours of time. Respondent in turn has identified no reason for me to doubt the veracity of Petitioner's fee application and the representations it contains about the work Mr. Homer actually performed while traveling. The contested entry is the only one in which any of the Homer Firm attorneys billed at his or her full hourly rate while traveling. (Fee App. Opp. at 5). Nor do I find any independent reason to question the contents of his billing statements or their accuracy. I find that Ms. Barrett has met her burden in proving the reasonableness of the requested hourly rate for Mr. Homer's five contested hours of traveling, and I will therefore allow it in the fee award.

3.        Overall Reasonableness of Attorneys' Fees Requested

Beyond such specific objections, Respondent generally asserts that the total amount Petitioner requests in attorneys' fees ($47,780.10) is "patently unreasonable" because "there was little need to spend significant 'legal' time on the case." (Fee App. Opp. at 4). This is because "Respondent conceded the case early in the proceedings, no experts were involved, no hearing was conducted and, other than the amended petition, no substantive legal pleading was required by petitioner." (*Id.*) Petitioner counters that "[R]espondent misconstrues the complexity of this litigation." (Reply at 12). In Petitioner's view, "[t]his case was far more involved than most Vaccine Program cases." (*Id.* at 13). Specifically, Petitioner claims that "it was extremely difficult to accurately calculate damages." (*Id.* at 12).

Within six months of the filing of this action in June of 2009, Respondent had conceded Petitioner's entitlement to compensation for a Table injury. (*See* Respondent's Report, dated December 2, 2009 (ECF No. 18) at 1). But this does not tell the complete story of this case—or why it continued for an additional three years. The parties spent that entire period after the concession negotiating the compensation award. (*See* ECF No. 80 (Decision awarding Petitioner compensation on November 19, 2012)). The parties appear to have had significant disagreements concerning the calculation of damages, ultimately requiring mediation to help break the logjam. (*See* Minute Entry, dated July 10, 2012). Under similar circumstances, attorneys have been awarded their fees even though the parties' dispute centered on the form and nature of the damages award rather than the threshold entitlement question, and where Respondent conceded the case less than a year after the filing of the petition. *See, e.g.*, *Presgrave v. Sec'y of Health & Human Servs.,* No. 12-269V, 2013 WL 4759256, at *1 (Fed. Cl. Spec. Mstr. Aug. 9, 2013) ($42,094.30 awarded to the Homer Firm for attorneys' fees and costs). This objection thus provides no persuasive grounds to reduce or discount the requested attorney time.

C.        *Mr. Gismondi's Fees*

Petitioner also requests a fee award for Mr. Gismondi, whose work on this matter predated the filing of the petition, in the amount of $6,800.00. (*See* Fee App. at 93). From the billing record offered in support of this component of the Fee Application, it appears that Mr. Gismondi may have at one time intended to represent Petitioner in the action himself, but merely fielded Petitioner's inquiry about a Program petition, eventually referring the matter to the Homer Firm for its actual adjudication.

Respondent asserts that Mr. Gismondi's requested $400.00 rate is unreasonable and unsubstantiated. (Fee App. Opp. at 5; *see also* Fee App., Tab C). Respondent particularly notes that the Homer Firm- seasoned Vaccine Program attorneys with numerous past and current clients - themselves receive lower hourly rates. (Fee App. Opp. at 5). In response, Petitioner argues that $400.00 is a reasonable rate for an attorney of Mr. Gismondi's experience and ability. (Reply at 4). Petitioner also claims that Respondent's invocation of the Homer Firm's hourly rate is "inappropriate and misleading" because "Mr. Conway's rate of $300.00 is a compromised rate, which was negotiated by the parties several years ago." (*Id.*) [13]

1.    Reasonable Hourly Rate for Mr. Gismondi

As discussed above, determining an attorney's hourly rate of compensation in the Vaccine Program and under the lodestar analysis involves three steps. First, the hourly rate in the attorney's local area must be established. Second, the hourly rate for attorneys in Washington, D.C. must be established. Third, these two rates must be compared to determine whether there is a very significant difference in compensation – and if so, how to adjust the rate to be applied in the lodestar analysis. *See Avera*, 515 F.3d at 1353 (Rader, J., concurring). Counsel for petitioners are entitled to Washington, D.C. rates except "'where the bulk of [an attorney's] work is done outside the jurisdiction of the court and where there is a *very significant* difference in compensation favoring D.C.,'" in which case the local rate is to be selected. *Avera*, 515 F.3d at 1349 (quoting *Davis County Solid Waste Management and Energy Recovery Special Service District v. United States Environmental Protection Agency*, 169 F.3d 755, 758 (D.C. Cir. 1999)) (emphasis in original).

Here, Mr. Gismondi's work appears to have been exclusively performed outside of the forum, so the evaluation of his hourly rate must take into account differences between the forum and the city in which he works – Pittsburgh, Pennsylvania.

a. *Reasonable Hourly Rate in Pittsburgh* – Petitioner has presented little evidence in support of Mr. Gismondi's proposed $400 hourly rate, beyond a conclusory affidavit from Mr. Gismondi averring that his years of experience and resulting litigation skills merit such a rate. (*See* ECF 90-1 (June 24, 2013 Gismondi Aff.) at ¶¶ 5-7). I have been presented with no other evidence that would cause me to doubt that Mr. Gismondi is the experienced tort litigator he purports to be. However, Mr. Gismondi has not previously practiced in the Vaccine Court, and thus his lack of experience in this particular forum has some bearing on the question of his reasonable rate. In addition, since Mr. Gismondi is, by his own admission, "essentially a contingent fee lawyer" (Gismondi Aff. at ¶ 5), he himself may not have a strong sense of what rate he could profitably and realistically charge were he to bill his time for this sort of matter on an hourly basis. That, however, is the proper standard by which to determine Mr. Gismondi's hourly rate. *Saxton*, 3 F.3d at 1521. I therefore cannot give substantial weight to Mr. Gismondi's *ipse dixit* assertions that $400 an hour is a fair charge for his services in this case.

---

[13] Indeed, Petitioner questions whether the $300 rate is a fair benchmark for comparison, noting that Mr. Conway has consistently requested a higher rate. (*See, e.g.*, Fee Application at 4 ($318.00 in 2008), 21 ($335.00 in 2011)).

I have found no other instances in which a special master determined the proper hourly rate for lawyers in the Pittsburgh, Pennsylvania area.[14] But there are many cases outside the Vaccine Program – in particular, civil matters from the U.S. District Court for the Western District of Pennsylvania - that provide some context for what might be a reasonable rate for Pittsburgh-based lawyers. In a sample of such cases, the awarded rate has varied between $165 and $285 an hour. *See, e.g., Sadler v. Balboa Capital Corp.*, No. 09-411, 2014 WL 839466, at *5 (W.D. Pa. Mar. 4, 2014) (hourly rates of $185.00-$300.00); *Dino v. Pennsylvania*, No. 08-1493, 2013 WL 6504749, at *3 (W.D. Pa. Dec. 11, 2013) (hourly rate of $285.00); *DirecTV, Inc. v. Figler*, No. 04-773, 2008 WL 382758, at *2 (W.D. Pa. Feb.11, 2008) (hourly rates of $200.00 and $250.00); *Guy Chem. Co., Inc. v. Romaco AG*, No. 06-96, 2007 WL 1276909, at *2 (W.D. Pa. May 1, 2007) (hourly rates of $240.00, $180.00, and $135.00); *Leach v. Northwestern Mut. Ins. Co.*, No. 01-2364, 2006 WL 3333098, at *1 (W.D. Pa. Nov. 16, 2006) (hourly rates of $250.00, $165.00, and $160.00), *aff'd*, 262 F. App'x 455 (3d Cir. 2008).

Based on the above, I find that a reasonable hourly rate for a Pittsburgh-based practitioner in a civil case is in the range of $200 to $300 an hour for someone of Mr. Gismondi's experience. The rate Ms. Barrett requests seems excessively high even for an extremely successful Pittsburgh-based litigator, and Ms. Barrett's fee application does not provide sufficient evidentiary support for a rate so much greater than that of other litigators in comparable settings.

    b. *Reasonable Hourly Rate in Washington, D.C.* - Determining a reasonable hourly rate can be difficult because there is relatively little guidance about how to determine the prevailing market rate for similar services. *See Information Sciences Corp. v. United States*, 86 Fed. Cl. 269, 291 (2009) (noting that although the Supreme Court held that paralegal fees are to be awarded at "prevailing market rates," the Supreme Court "did not provide trial courts with guidance in how to determine 'the prevailing market rate'"). However, two recent decisions of this court – *Masias v. Sec'y of Health & Human Servs.,* No. 99-697V, 2009 WL 1838979 (Fed. Cl. Spec. Mstr. June 12, 2009), *review denied*, No. 99–697V, slip op. at 11 (Fed. Cl. Dec. 10, 2009), *aff'd*, 634 F.3d 1283 (Fed. Cir. 2011), and *Rodriguez*, 2009 WL 2568468 – provide a helpful yardstick.

    In *Masias*, a special master found that a reasonable rate for experienced attorneys from Washington, D.C. who represent petitioners in the Vaccine Program was $250 to $375. *Masias*, 2009 WL 1838979, at *25. Another special master arrived at a similar rate in *Rodriguez.* After analyzing a wide scope of evidence, the special master in *Rodriguez* found that a reasonable hourly rate for attorneys with more than 20 years of experience and with clear experience in the Vaccine Program was $275-$360 per hour, depending on the year the work was performed. *Rodriguez*, 2009 WL 2568468 at *15.

    I find both the *Masias* and *Rodriguez* decisions rigorous in their analysis and particularly persuasive. Accordingly, I adopt their reasoning that a reasonable range for attorneys with ten or more years of experience providing services in the Vaccine Program in Washington, D.C. is

---

[14] In *Fowler*, a special master awarded fees to a Pittsburgh attorney based upon a $260 hourly rate and Respondent did not object to the rate. *Fowler*, 2013 WL 5513880, at *1. This decision is somewhat consistent with the rate I have adopted herein, even though it does not provide substantial precedential support.

$250 to $375 per hour. Because both of these decisions are from 2009, however, I must also adjust the proposed fee ranges for subsequent inflation. The Bureau of Labor Statistics has a Consumer Price Index ("CPI") Inflation calculator, which uses the average CPI for a given calendar year. *CPI Inflation Calculator,* U.S. Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator.html (last updated April 15, 2014). The data upon which the calculation is based reflect yearly changes in prices of all goods and services purchased for consumption by urban households. (*Id.*) Based upon the latest monthly index value, $250 in 2009 has the same buying power as $275.35 in 2014( *Id.*), while $375 in 2009 has the same buying power as $413.03 in 2014. (*Id.*) Accordingly, the 2014 version of this range is appropriately considered $275 - $413.

                 c. *Comparing Local Rate to Forum Rate* - As noted above, the forum rates should be used to determine an attorney's hourly rate except when two factors identified in *Davis County* are met. The first factor is fulfilled when "'the bulk of [an attorney's] work is done outside the jurisdiction of the court." In this case, it appears all of Mr. Gismondi's prefiling work was performed outside of the District of Columbia.

The second factor requires "a very significant difference in compensation favoring D.C." What constitutes a "very significant difference" is not defined, and case law does not provide much guidance.[15] In this case, I find there is a significant difference between the compared rates. The highest Pittsburgh rate, $300 an hour, is only $25 more than the lowest D.C. rate adjusted for inflation. The difference between the higher ends of both rate spreads ($300 in Pittsburgh versus $413 in D.C.) is thus significant, with the D.C. rate 38 percent higher. Accordingly, I will apply the Pittsburgh rate rather than the D.C. rate.

The final issue to be determined is where Mr. Gismondi should fall on the spectrum of appropriate rates. I do not find that Mr. Gismondi's rate should be $300 per hour, since $400 per hour already seems high and overall it appears Mr. Gismondi simply took care of the case in its prefiling stages until the Homer Firm became involved. The fact that Mr. Gismondi also lacks experience in the Vaccine Court, no matter his general experience as an attorney, further informs my view that the highest rate permitted in the relevant forum is not appropriate.

I also find relevant that the Homer Firm's negotiated rate is less than Mr. Gismondi's suggested rate. Petitioner's counsel are among the most experienced Vaccine Program attorneys that appear in this forum, and yet even for work performed more recently (in which case the rate is subject to an inflation adjustment) they do not receive what might be considered the "top" rate in Washington, D.C. for their vaccine court work. (*See* Fee Application at 4 (Mr. Conway's

---

[15] In *Avera*, such a significant difference was found to exist because the local rate ($200) was nearly $400 less than the claimed forum rate. *Avera*, 515 F.3d at 1349-50. *Avera* also cited with approval the finding in Davis County that local rates were appropriate when rates in Washington, D.C. were 70 percent higher. But there are few Vaccine Program decisions that address the matter. *See, e.g., Sabella v. Sec'y of Health & Human Servs.,* No. 02-1627V, 2008 WL 4426040, at *5 (Fed. Cl. Spec. Mstr. Sept. 23, 2008), *rev'd on non-relevant ground,* 86 Fed. Cl. 201 (2009) (counsel's local rate of $300 per hour found to be significantly different from forum rate when local rate was 46 percent lower).

hourly rate of $318.00 in 2008), 34 (Mr. Homer's hourly rate of $322.00 in 2013)). The fact that this rate may reflect a global compromised rate, negotiated in advance with Respondent for all of the Homer Firm's appearances in Vaccine Program litigation, does not justify a higher rate in this case for Mr. Gismondi, especially when he never appeared in this action (and in fact has never represented a single petitioner under the Act before or since Ms. Barrett). A referring attorney who performs little substantive work in a Vaccine Program case should not receive a rate higher than the lawyer(s) who actually performed the bulk of the work in the case.

Attorneys practicing in the Vaccine Program are entitled only to "reasonable attorneys' fees." 42 U.S.C. § 300aa–15(e). This reasonableness standard flows logically from the fact that the source of payment of those fees is the "Vaccine Injury Compensation Trust Fund," which exists directly to benefit those injured by vaccinations. 42 U.S.C. § 300aa–15(I). Payments to attorneys necessarily deplete the Trust Fund, and even if such payments aid in the prosecution of claims on behalf of injured parties, it cannot be said that the financial interests of attorneys appearing in Program cases was a direct concern of Congress in creating the Fund. By using the term "reasonable," Congress has charged special masters (and the judges who review decisions of special masters) to balance the competing concerns.

I therefore find that, based on application of the above-referenced tests, as well as based upon my discretion, the appropriate reasonable hourly rate for Mr. Gismondi in this case is $250.00.[16] This figure is directly within the forum's range. I do not find that Mr. Gismondi is entitled to the requested $400 rate, both because Petitioner has not substantiated the reasonableness of this rate and also because I do not find support for the rate either in the decisions of the Vaccine Court or in other federal decisions involving statutes providing for fee awards.

2.      Reasonable Hours for Mr. Gismondi's Services

Although Respondent objected only to Mr. Gismondi's proposed hourly rate, I also find (in the exercise of the discretion afforded me under Section 15 of the Act) that some of Mr. Gismondi's requested time is not reasonable. *Perreira*, 27 Fed. Cl. at 34 (special masters have "wide discretion in determining the reasonableness" of attorneys' fees and costs), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

A referring attorney who performs no direct work in the litigating of a Vaccine Court petition can nevertheless obtain a fee award. *See, e.g.*, *Bell v. Sec'y of Health & Human Servs.*, No. 07-454V, 2008 WL 4657081, at 1 (Fed. Cl. Spec. Mstr. Oct. 2, 2008); *Hussey v. Sec'y of Health & Human Servs.*, No. 89-69V, 1990 WL 293391, at *3-4 (Fed. Cl. Spec. Mstr. June 27, 1990). However, the reasonableness of a referring attorney's pre-filing activity is subject to the same standard that governs the fee requests of the attorneys who actually litigated the case. *See, e.g., Farrar v. Sec'y of Health and Human Servs.*, No. 90-1167V, 1992 WL 336502, at *3 (Fed. Cl. Spec. Mstr. Nov. 2, 1992) ("[g]enerally, prefiling tasks require merely speaking with

---

[16] This is not to say that, were Mr. Gismondi to represent a petitioner in another case and perform more of an active and direct role in the litigation, he would not be entitled to a higher hourly rate. I simply do not find in this particular case that such a higher rate is appropriate.

petitioners, becoming familiar with the Act, and obtaining and analyzing medical records"). The requested fees of referring attorneys have been reduced where they appear excessive, especially where the referring attorney's role in the case diminished after its filing. *See, e.g.*, *Haley v. Sec'y of Health & Human Servs.*, No. 90-3842, 1992 WL 368003, at *4 (Fed. Cl. Spec. Mstr. Nov. 20, 1992) (referring attorney's time reduced from 102.5 hours to 28.6 hours where attorney worked on matter for only four months before referral and thereafter did not participate in subsequent status conferences or the entitlement hearing); *Hussey*, 1990 WL 293391, at *5 (reducing requested fees of referring attorneys from $13,973.47 to $2,600.00 – a reduction of over 80%). I will therefore evaluate whether Mr. Gismondi's pre-filing acts were reasonable, necessary, or duplicative of other work performed in the case by Homer Firm attorneys.

Mr. Gismondi's one-page billing statement memorializes 17 hours of work performed between December 2006 and September 2008 - nine months before the actual filing of the petition. In some cases a referring attorney might perform vital prefiling work that makes the work of the attorneys who actually litigated the petition easier. I have some concerns that the Homer Firm's unquestionable expertise with Vaccine Act claims, and resulting efficiency in handling them, means that there was some minor duplication of effort.[17] I will not penalize Mr. Gismondi for this, however, as it is conceivable that he may have originally expected to initiate Ms. Barrett's claim himself rather than refer the case to the Homer Firm.

Mr. Gismondi's billing records also appear to request fees for time he spent gaining expertise in the Program. For example, Mr. Gismondi billed two hours of time on October 15, 2007 for "analysis of recovery under Vaccine Act," and then in September of 2008 billed an additional 90 minutes for "legal research regarding Vaccine Act." (*See, e.g.,* Tab C to Fee App. at 93). But Mr. Gismondi should not receive compensation for engaging in professional development concerning the Vaccine Program and its applicable rules and case law, especially not when the matter was later referred to attorneys with demonstrated expertise in this field. I will therefore not compensate him for these 3.5 hours of time.

Overall, I find that Mr. Gismondi's time (and in particular, his client meetings and initial case review) should be compensated, even if he did not ultimately steer the case to conclusion. Multiplying the reasonable hourly rate for Mr. Gismondi's services ($250.00) by the number of hours I deem reasonable (17-3.5 = 13.5) results in a total award of $3,375.00 – a reduction of $3,425.00.

---

[17] The billing records reflect this. Beginning in October of 2008, the attorneys at the Homer Firm spent approximately 5.7 hours performing pre-filing work, while its paralegals spent approximately 9.0 hours, billing approximately $2600 in total– less than half of the costs requested by Mr. Gismondi for his pre-filing activities (Tab A to Fee App. at 1-4).

**CONCLUSION**

Based on all of the above, the following chart sets forth the total calculation of Petitioner's fee award:

| Contested Sum | Amount Requested | Reduction | Total Awarded |
|---|---|---|---|
| Guardianship Future Costs | $49,725.00 | $49,725.00 | $0.00 |
| Guardianship Establishment Costs | $1,192.00 | none | $1,192.00 |
| Homer Firm Fees (inclusive of supplemental fee requests) | $54,268.20 | none | $54,268.20 |
| Homer Firm Costs | $47,720.41[18] | none | $47,720.41 |
| Mr. Gismondi's fees | $6,800.00 | $3,425.00 | $3,375.00 |

I reduce Petitioner's fee application by the amount of $53,150.00, thereby awarding Petitioner a total of $106,555.61. This amount reflects the total amount awarded for Petitioner's four motions for attorneys' fees and costs, and includes the three supplemental motions seeking fees associated with litigating this dispute. Accordingly, an award should be made as follows:

in the form of a check jointly payable to petitioner and the law firm of Conway, Homer & Chin-Caplan, P.C., in the amount of **$106,555.61**.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of this decision.[19]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Special Master

[18] This amount excludes the $1,192 in Mr. Flynn's time devoted to establishing the guardianship, but which Petitioner's fee application characterized as an attorney cost. It has been addressed separately due to Respondent's specific objection but (as the chart indicates) is awarded.

[19] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.